REESE v. BRUCE.

Opinion delivered November 11, 1918.

1. EQUITY—LACHES.—Equity will not entertain stale claims, and will, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay.

2. EQUITY—LACHES.—Where heirs waited 37 years before asserting their rights and until evidence had been lost by death of persons to whom the facts were known, equity will deny relief on the ground of laches.

Appeal from Pope Chancery Court; *Jordan Sellers,* Chancellor, affirmed.

*D. B. Sain,* for appellants.

1. All the exhibits to the complaint may be looked to on demurrer and will control the allegations where they are conflicting. 112 Ark. 572; 91 *Id.* 400; 29 *Id.* 444; 90 *Id.* 190; 99 *Id.* 218; 104 *Id.* 459. Interveners are the owners of the land in controversy. No one has been in the peaceful adverse and continuous possession long enough to invoke the statute of limitations.

2. Neither the statute of limitations nor laches is available against interveners. The guardian sold his ward's land and invested in other lands and took deeds in his own name. Where guardians deal with their ward's property and were never discharged by the probate court, they cannot plead limitation. 48 Ark. 248.

3. If not the absolute owners, there was a resulting trust in favor of interveners and limitation and laches cannot be pleaded. 17 R. C. L. 795, § 795; 74 N. E. 933; 2 Perry on Trusts (6 ed.), 1418; K. & C. Digest, § 3998.

4. The doctrine of laches cannot defeat our claims. Laches is not merely delay. 103 Ark. 251; 82 *Id.* 367. Mere lapse of time is no bar. 121 Ark. 423.

*R. B. Wilson* and *Hays & Ward,* for appellees.

1. The exhibits do not support the allegations of the intervention.

2. Appellants are barred by the statute of non claim and by laches. 94 Ark. 60, 64; 33 *Id.* 658; 45 *Id.* 495; 39 *Id.* 577; 23 *Id.* 604; 18 *Id.* 334; 54 *Id.* 33.

3. No resulting trust was established. 118 Ark. 146; 105 *Id.* 323; 75 *Id.* 446; 104 *Id.* 303.

4. The claim is stale. Tate held the lands openly, notoriously and adversely for 19 years. No excuse for the long delay is alleged. 18 A. & E. Enc. Law 106; 21 Wall. 178; 2 *Id.* 95; 23 Ark. 336.

5. Appellants have slept upon their rights. They have shown no diligence. 81 Ark. 279; 55 *Id.* 85; 7 How. 234; 1 *Id.* 149; 2 Wall. 87; 95 Ark. 178; 137 U. S. 556.

6. Laches will bar even a resulting trust. 1 Perry on Trusts (3 ed.), 431; 18 Ala. 50; 52 Am. Dec. 212; 7 Howard 234; 2 Story Eq. Jur. (12 ed.), § 1520; Pom. Eq. Jur., § 418; 1 Perry on Trusts (1 ed.), 228; 99 U. S. 201; 73 Cal. 285; 2 Am. St. 791; 41 Ark. 301; 17 Wall. 336; 2 Wall. 87; 46 Ark. 25. See also 61 Ark. 575.

HUMPHREYS, J. W. W. Tate died intestate on the 29th day of May, 1899, leaving him surviving Amanda Tate, who was his third wife, and twelve children, four

by each marriage. On the 23d day of January, 1917, three children by his first marriage, Mrs. Lillie Reese, Henry H. Tate and Mrs. Alma Dorsey, and one grandchild by said marriage, Mrs. Vera 'Chessir, joined with the four children by the second marriage, Mrs. Mattie Bruce, Mrs. Dora Nixon, Mrs. Mary Wilson and James Tate, in a suit for the partition of 209 acres of land near Russellville, in Pope County, against the surviving widow, Mrs. Amanda Tate, and the surviving children of W. W. Tate and Amanda Tate, in the Pope Chancery Court. It was alleged that W. W. Tate was the owner in fee of said tract of land when he died; that on the date of his death he resided with his wife and minor children on said real estate, or a part thereof, as his homestead; that, thereafter, until 1904, appellees resided on said real estate, at which time, they abandoned the land as a homestead, but that the surviving widow, Amanda Tate, continued to control the property and to collect the rents therefrom; that the minor children were entitled to share in the rents and profits until each attained the age of twenty-one years; that the widow had used for her own benefit all the rents and profits and had failed to account for one-half thereof to the children entitled thereto until the year 1904, and had failed to account for all the rents and profits to the children entitled thereto after 1904, and until this suit was instituted. Appellees answered separately, denying the abandonment of the homestead or that the surviving widow, Amanda Tate, was indebted on account of rents and profits to any of the petitioners or to her own children.

Appellants, Mrs. Lillie Reese, Henry H. Tate, and Mrs. Alma Dorsey, who were children by the first marriage, and Mrs. Vera Chessir, daughter of Mrs. Lula Chessir, who was a child of the first marriage, then filed an intervention, denying that W. W. Tate was the owner of said real estate in fee when he died, and in which intervention they alleged that W. W. Tate, their father, was appointed guardian for them in Howard County; that he applied for and obtained an order to sell their lands in

Howard County for reinvestment in Pope County lands; that, pursuant to the order, he sold said lands for $1,200 and invested the amount a short time after the sale on November 20, 1880, in Pope County lands and took the deed therefor in his own name; that said lands were chargeable with a resulting trust in their favor for said amount, with six per cent. interest thereon from the date of the purchase. The interveners filed the guardianship proceedings of the sale of their interest in the Howard County lands as exhibits to their complaint, which exhibits disclosed, in substance, that their mother and grandmother, Martha E. Tate, widow of William Clardy, and W. W. Tate, their father, married on the 2nd day of July, 1865; that at the time of the marriage their mother had two children, Sarah E. Clardy and James W. Clardy; that at the time she owned 100 acres of land as legatee under her father's will and an interest in 160 acres as widow of her former husband, William Clardy; that in a partition suit between their mother and the Clardy children, through oversight, the lands were put in hotch-potch and divided by the commissioners, 120 acres to their mother and 70 acres, each, to the Clardy children; that deeds were never made by the commissioners to their mother and the Clardy children, but simply set off and designated so that each might know his part; that these interveners, born subsequent to the partition of the Howard County lands between their mother and the Clardy children, had an undetermined interest in said lands, and that to the end that said uncertain and undetermined interest might be definitely ascertained and reduced to possession, their guardian procured an order and sold said lands on November 20, 1880.

Appellees demurred to the intervention on the ground that the interveners had been guilty of laches. The demurrer was sustained and the interveners refused to plead further. Thereupon, the chancellor entered a final decree dismissing the intervention for the want of equity, from which an appeal has been prosecuted to this court.

It is insisted by appellants that the allegations in the intervention are sufficient to establish a resulting trust in the Pope County lands in favor of interveners, and that the chancellor erred in holding otherwise. It appears from the face of the intervention that the proceeds of the sale of the Howard County lands were invested in the Pope County lands soon after the Howard County lands were sold on November 20, 1880, and that W. W. Tate entered into immediate possession thereof under deed in his own name and remained in possession until he died, on the 29th day of May, 1899; that the appellees, consisting of his widow, Amanda Tate, and her children, remained in possession thereof until 1904, and that thereafter, until the institution of this suit, said widow controlled the lands and collected the rents thereon; that W. W. Tate's children and the mother of the grandchild, who have intervened, attained their majorities long before he died without asserting any claim to the lands in his lifetime nor for eighteen years after his death. It is not alleged in the intervention that the interveners were ignorant of their rights nor that any impediment or hindrance existed to an earlier prosecution of their claim. No excuse whatever is pleaded for their long delay in instituting suit. In the first place, the allegations concerning the establishment of the trust are meager. It is true that it is alleged in the intervention that appellants' lands in Howard County were sold by their guardian for the purpose of reinvestment in lands in Pope County, but the exhibits, if treated as controlling the allegation, show that the lands were sold for a different purpose entirely. In the petition filed as an exhibit, for the sale of the Howard County lands, it was stated that the purpose of the sale was to ascertain and reduce to possession an uncertain and an undetermined interest of appellants in said lands. It is true that it is alleged in the intervention that prior to the sale, and about the time of the sale, the appellants' guardian, W. W. Tate, stated that he was selling his wards' lands for the purpose of reinvestment in Pope County lands. While it is alleged in the petition that the

proceeds were so invested, no allegation is made that at the time he purchased the lands or entered into possession of them under his deed he had procured them for or was holding them as trustee for his children. But, treating the establishment of the trust as sufficiently alleged, the bill is certainly deficient and subject to demurrer for failure to assign sufficient reason for their long acquiescence in the possession of W. W. Tate, his surviving widow, and the children by the third marriage. It is apparent from the reading of the complaint that they permitted their guardian to occupy the lands in Pope County openly, notoriously and adversely for a period of 19 years without raising any question concerning their rights or exacting an accounting from him, although each had attained his majority during that time, and that subsequent to his death they acquiesced in the possession and control of said real estate by the widow and minor children for 18 years before asserting a claim to said real estate as *cestuis que trust*. It is said in the case of *Badger v. Badger*, 2 Wallace 95, that the party who appeals to the chancellor in support of a claim where there has been laches in prosecuting it or long acquiescence in the assertion of adverse rights, ''should set forth in his bill specifically what were the impediments to the earlier prosecution of his claim; how he came to be so long ignorant of his rights and the means used by the respondent to fraudulently keep him in ignorance, and how and when he first came to a knowledge of the matters alleged in his bill, otherwise the chancellor may justly refuse to consider his case on his own showing,'' etc. The rule announced in *Badger v. Badger, supra,* was approved in *Marsh v. Whitmore,* 21 Wallace 178. It is well settled by authority in this State that a court of equity will not entertain stale claims, and will, ''in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay.'' *James, Admx., v. James et al.,* 41 Ark. 301; *Gibson v. Herriott,* 55 Ark. 85; *Sturdivant v. Cook,* 81 Ark. 279; *Segers v. Ayres,* 95 Ark. 178. But for an additional reason it was proper to sustain the demurrer to

the intervention in the instant case. It appears on the face of the bill that W. W. Tate died on the 29th day of May, 1899. If appellants had instituted this suit in his lifetime, he could have explained the character of his title and possession thereunder. Appellants have waited until conditions have changed and until appellees have been deprived of the evidence of their father. This court said, in the case of *Tatum* v. *Arkansas Lumber Co.,* 103 Ark. 251, that the true doctrine concerning laches was announced by Mr. Pomeroy, as follows: "Laches, in legal significance, is not mere delay, but delay that works disadvantage to another. So long as the parties are in the same condition, it matters little whether he presses a right promptly or slowly within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has in good faith become so changed that he can not be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right. This disadvantage may come from the loss of evidence, change of title, intervention of equities, and other causes, but when a court sees negligence on one side, and injury therefrom on the other, it is a ground for denial of relief. 5 Pomeroy, Eq. Jur. (3 ed.), section 21."

If the trust was sufficiently alleged, appellants have lost any rights under it by this long, unexplained delay in attempting to enforce them. If the trust existed, they had every opportunity to know of its existence since their childhood. They attained their several majorities before their father died and they should have raised the question with him in his lifetime. We think this a clear case for the application of the doctrine of laches. For failure on the part of appellants to allege diligence, the decree of the chancellor is affirmed.